## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ZACHARY CALDWELL | : | Case No. 3:20-cv-186 (OAW) |
| *Plaintiff,* | : | |
| | : | |
| *v.* | : | |
| | : | |
| STAMFORD ANESTHESIOLOGY | : | |
| SERVICES, P.C., | : | |
| STAMFORD HOSPITAL, and | : | |
| JOEY PAPA, | : | |
| *Defendants.* | | |

## RULING ON PLAINTIFF'S & DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

This case arises out of a workplace dispute between Plaintiff Zachary Caldwell ("Plaintiff"), a certified registered nurse anesthetist ("CRNA"), and Defendant Joey Papa, M.D. ("Dr. Papa"), a general surgeon. Although the parties disagree as to the nature of their dispute, they agree that an incident involving physical contact occurred between Plaintiff and Dr. Papa while they were in the operating room at Stamford Hospital ("Hospital") on September 8, 2018. Plaintiff brings tort claims for assault and battery against Dr. Papa, and employment claims for both gender discrimination and retaliation against the Hospital, as well as against his employer, Defendant Stamford Anesthesiology Services, P.C. ("SAS") (collectively with Dr. Papa and Hospital, "Defendants"). All parties have moved for summary judgment. For the reasons stated herein, Defendants' motions for summary judgment (ECF No. 71, 75, 79) hereby are **GRANTED** as to all counts of the complaint, and Plaintiff's motion for summary judgment (ECF No. 76) hereby is **DENIED**. The Clerk of Court is directed to render judgment for Defendants in accordance with this opinion and to terminate this case from the court's docket.

## I.   BACKGROUND

The following facts are collected upon review of the record, including any exhibits filed with each party's summary judgment motion, and the statement of facts submitted pursuant to Local Rule 56(a).  *See* Hospital's L.R. 56(a)(1) Stmt., ECF No. 73 [hereinafter "Hosp. Stmt."]; SAS's L.R. 56(a)(1) Stmt., ECF No. 75-2 [hereinafter "SAS Stmt."]; Pl.'s L.R. 56(a)(1) Stmt., ECF No. 77 [hereinafter "Pl. Stmt."]; Dr. Papa's L.R. 56(a)(1) Stmt., ECF No. 79-2 [hereinafter "Dr. Papa Stmt."].   They are undisputed, unless otherwise indicated:

Plaintiff is a CRNA, SAS Stmt. ¶ 2, which is an advance practice registered nurse who administers anesthesia for surgeries and other medical procedures.[1]  Plaintiff was hired by an anesthesiology practice, SAS, to work in the anesthesia department of the Hospital in July 2018.[2]   SAS Stmt. ¶ 2; Ex. M, ECF No. 73-1, at 141 (Plaintiff's Offer Letter).   Dr. Papa is a general surgeon who has been employed by the Hospital since 2008.   Dr. Papa Stmt. ¶ 3; Dr. Papa Dep. 15:5–8, ECF No. 79-3, at 25.   She also is a member of the Hospital's medical staff.[3]   Mancino Dep. 31:19–24, ECF No. 90-2, at 35.

---

[1] *See* Nurse Anesthetist, Cleveland Clinic, https://my.clevelandclinic.org/health/articles/22561-nurse-anesthetist-crna [https://perma.cc/6XYH-T5GJ] (last visited Sept. 18, 2023).

[2] The parties disagree as to whether Plaintiff was employed exclusively by SAS, or whether he was co-employed by both SAS and Stamford Hospital.   Plaintiff's offer letter from SAS states "your primary responsibility to SAS and the Department of Anesthesiology at Stamford Hospital will be to deliver high level anesthesiology services to the patients served by SAS."   Ex. M, ECF No. 73-1 (Plaintiff's Offer Letter).

[3] Dr. Papa represents that she is employed by an entity known as "Stamford Health Medical Group," which is an affiliate of the Hospital.   *See* Dr. Papa Mem. of Law 3, ECF No. 79-1.   The record, however, including Dr. Papa's own deposition testimony, and the testimony from the Hospital's human resources director, Salvatore Mancino ("Mr. Mancino"), indicate that Dr. Papa is an employee of the Hospital.   *See* Dr. Papa Dep. 15:5–8, ECF No. 79-3, at 25; Mancino Dep. 31:19–24, ECF No. 90-2, at 35.   Neither the deposition statements from Dr. Papa nor Mr. Mancino – nor any other portion of the record – corroborate the existence of an employment relationship between Dr. Papa and an entity by the name of "Stamford Health Medical Group."

On September 6, 2018, Plaintiff's supervisor, Dr. Steven Finkel of SAS, assigned Plaintiff to work on a procedure being performed by Dr. Papa that afternoon in operating room 2 ("OR2").  Hosp. Stmt. ¶ 8.  Plaintiff was informed of the assignment only after leaving a patient in the recovery room and returning to the fishbowl.  *See* Pl.'s L. R. 56(a)(2) Statement in Opp'n to Def. Stamford Hospital's Mot. for Summ. J. ¶ 8, ECF No. 87-1 [hereinafter "Pl.'s 56(a)(2) Stmt."]; Pl.'s Dep., Ex. D 99:13–20, ECF No. 87-2, at 43 (describing the fishbowl as the "brain" of the operating room).  Upon entering the fishbowl, Dr. Finkel informed Plaintiff that he was supposed to be in OR2 and that they have been paging anesthesia to OR2 via the Hospital's overhead announcement.  *See* Pl.'s Dep., Ex. D 99:21–100:7, ECF No. 87-2, at 43–44; *see also* Dr. Steven Finkel's Dep., Ex. E 39:22–40:7, ECF No. 87-2, at 63–64; Pl.'s 56(a)(2) Stmt. ¶ 8.  Because Plaintiff was not previously informed, he did not know what the case was, who the surgeon was, who the patient was, the patient's history, or numerous other things he typically would learn prior to accepting an assignment.  Pl.'s Dep., Ex. A 100:8–13, ECF No. 75-3, at 9.  Despite the lack of notice, Plaintiff hurriedly walked to OR2 where he saw Dr. Papa standing next to the patient.  SAS Stmt. ¶ 15.  Plaintiff had not previously worked with Dr. Papa.  Dr. Papa Stmt. ¶ 10.  Also present were resident nurse Maricar Wuthijaroen ("Nurse Wuthijaroen"), resident nurse Rose Bambales ("Nurse Bambales"), and surgical resident Dr. Meaghan Broderick ("Dr. Broderick").  Hosp. Stmt. ¶ 34.

After entering OR2, Plaintiff stated that he was unfamiliar with this case and the patient, and that he needed to look up the patient's information before administering anesthesia.[4]  Dr. Papa Stmt. ¶ 13; Pl.'s Dep., Ex. A 101:6–10, ECF No. 75-3, at 10; Dr.

---

[4] The parties disagree as to the context in which Plaintiff announced his unfamiliarity with the case. In his deposition, Plaintiff testified that upon entering OR2, Dr. Papa informed the patient that he would now be

Papa Dep. 37:18–38:6, ECF No. 79-3, at 28–29.   The parties disagree as to what occurred next.   Plaintiff testified that Dr. Papa intercepted him physically, grabbed his arm, and pressed her fingers into his right arm, scolding him for announcing his unfamiliarity of the case in front of the patient.   Pl.'s Dep. 102:2–10, ECF No. 75-3. According to Dr. Papa, however, she merely reminded Plaintiff that the patient was still awake and that the patient could hear Plaintiff.   Dr. Papa Dep. 42:6–8, ECF No. 79-3, at 32.   Dr. Papa claims that Plaintiff became upset and began to leave the OR.   *Id.* at 42:8–16.   Attempting to prevent Plaintiff from storming past her, Dr. Papa claims to have reached her hand out to his arm to try and stop him, and to diffuse the situation.   *Id.* 42:14–22.

The complaint states that Dr. Papa "violently" grabbed Plaintiff and "wrenched Plaintiff's arm."   Compl. ¶¶ 27, 29.   It further alleges that Dr. Papa "struck Plaintiff with [her] hands and fists and pushed and shoved him," *id.* ¶ 109, and "beat[]" him, *id.* ¶ 110. There is no evidence to support the allegations in the complaint that Dr. Papa "beat" Plaintiff with her fists, or that she pushed and shoved him.[5]   A review of the record, including Plaintiff's own statement of material facts, reveals that "Dr. Papa touched

_____

put to sleep, to which Plaintiff responded that he was unfamiliar with the case and needed to review the patient's information.  Pl.'s Dep. 101:2–5, ECF No. 75-3, at 10.  Dr. Papa, however, testified that Plaintiff entered OR2 without acknowledging anyone and announced his unfamiliarity with the patient.  Dr. Papa Dep. 37:18–38:6, ECF No. 79-3, at 28–29.  Regardless, it is undisputed that at some point after entering OR2, Plaintiff expressed that his lack of familiarity with the case.

[5] None of the witnesses in the operating room could confirm that "beating incident" with fists and pushing and shoving occurred.  For example, Nurse Wuthijaroen testified at her deposition that she was unsure whether Dr. Papa grabbed Plaintiff's arm.  Wuthijaroen Dep. 52:15–17, ECF No. 79-3 at 57.  Nurse Bambles testified that she did not see Dr. Papa touch Plaintiff on the arm.  Babales Dep. 18:17–19, ECF No. 79-3 at 66.  The patient, who was also deposed for purposes of this case, was unable to recall any details beyond the fact that a "commotion" occurred.  John Doe Dep. 22:8–10, ECF No, 79-3 at 73.  Dr. Broderick, in the Hospital's subsequent investigation of the incident, could not corroborate Plaintiff's allegations that Dr. Papa "beat" him.  See Pl.'s L. R. 56(a)(2) Stmt. ¶ 18 (noting that Dr. Broderick observed the physical touching, where Dr. Papa "put her hand on him," but that Plaintiff's response was "extreme").  Finally, Plaintiff did not need medical care to address the unwanted touching, and he could not recall any bruising or skin irritation. Pl.'s Dep. 115:16–116:12, ECF No. 75-3, at 16–17.

Plaintiff on his forearm close to his elbow."  Pl.'s Stmt. ¶ 9; *see* Pl.'s Dep. 102:3–10, ECF No. 75-3, at 11.   Plaintiff admitted in his interview in the Hospital's subsequent investigation that Dr. Papa's touch was not a "forceful grab."  Mancino Dep. 98:5–9, ECF No. 73-1, at 59.  Dr. Papa admitted to a momentary light touching of Plaintiff's arm, with no force.  Dr. Papa Dep. 46:7–15, ECF No. 79-3, at 34.  Accordingly, the court accepts as an undisputed fact that an unwanted touching—but not a beating—occurred when Dr. Papa grabbed Plaintiff by the forearm.

After Dr. Papa touched Plaintiff's arm, Plaintiff pulled back his arm and started to leave the OR, stating that he could not work in such an environment.  SAS Stmt. ¶¶ 22, 23.  As Plaintiff rushed down the hall away from the OR, Dr. Papa began following him while shouting expletives at Plaintiff to get him to return to the OR.  *Id.* ¶ 25; Dr. Papa Dep. 52:2–53:23, ECF No. 79-3, at 37–38 (admitting that she said, "get back here," without remembering the exact language used).  Plaintiff continued walking to the anesthesia office where he encountered Dr. Finkel and another CRNA, Keith Denning ("Mr. Denning").  SAS Stmt. ¶ 27.  Plaintiff informed Dr. Finkel that he could not work in OR2, as Dr. Papa had berated him for expressing his lack of familiarity with the patient, directly in front of that patient.  *Id.*  ¶¶ 28, 30.  Plaintiff also reported to Dr. Finkel that Dr. Papa had grabbed his arm.  *Id.* ¶ 30.  At the same time, Dr. Papa entered the anesthesia office and yelled more expletives, including for Plaintiff to "[g]et the fuck back in the OR." Pl.'s Dep. 104:7, ECF No. 75-3, at 13; *see* Dr. Papa Dep. 54:23–55:7, ECF No. 79-3, at 39–40.  Dr. Finkel observed that a screaming match had erupted between Plaintiff and Dr. Papa.  SAS Stmt. ¶ 32.  Plaintiff then left the office and went to the locker room.  *Id.* ¶ 35; Pl.'s Dep. 104:10–21, ECF No. 75-3, at 13 (describing the sensation he felt once

inside the locker room).  Acknowledging that a patient was still laying on the operating table, Dr. Finkel attempted to diffuse the situation and Dr. Papa and Mr. Denning returned to the OR to complete the case.  Dr. Papa Dep. 56:9–17, ECF No. 79-3, at 41.  When Plaintiff returned to the anesthesia office from the locker room, he was informed by Dr. Finkel that he could go home for the day.  SAS Stmt. ¶¶ 37, 38.

Following the incident, Plaintiff was encouraged by SAS's partner, Dr. Betty Ann Robustelli ("Dr. Robustelli"), to report Dr. Papa to the Hospital's human resources department.  SAS Stmt. ¶ 44.  Plaintiff filled out a "QASys" report[6] describing his interaction with Dr. Papa, including her yelling, grabbing his arm, and chasing him down the hallway.  QAsys Report, Ex. G, ECF No. 75-9.  Chair for the department of surgery at the Hospital, Dr. David Yuh ("Dr. Yuh") received this QASys report and forwarded a copy to Salvatore Mancino ("Mr. Mancino"), the Hospital's human resources director. Hosp. Stmt. ¶ 13.  Mr. Mancino then commenced an investigation in which he met with Plaintiff, Dr. Papa, and all three Hospital employees who had been present during the incident.  *Id.* ¶¶ 15, 17.  The Hospital's investigation found that Dr. Papa had put her hand on Plaintiff, but that the interaction was such that an assault allegation "was not substantiated."  *Id.* ¶¶ 18, 19.  Mr. Mancino also found that in the ten years prior to the incident on September 6, 2018, no complaints of violent behavior had ever been filed against Dr. Papa.  *Id.* ¶ 22. However, Dr. Yuh was aware of past complaints from other providers regarding Dr. Papa's lack of professionalism, and he inquired whether the latest incident would be grounds for suspension of Dr. Papa's hospital privileges.  Dr. Yuh Dep. 27:19–28:11, ECF

---

[6] QASys is an event reporting system used by the Hospital for purposes of reporting incidents, including those involving Hospital employees.  Hosp. Stmt. ¶ 5.

No. 86-2, at 31–32.  Dr. Yuh surmised that Dr. Papa had an inability to control her anger properly, and explored whether the Hospital could recommend anger management for Dr. Papa.  *Id.* 64:5–18.  Ultimately, Mr. Mancino, Dr. Yuh, and the Chief Medical Officer, Dr. William Hines ("Dr. Hines"), decided that Dr. Papa should be counseled on her inappropriate behavior.  Hosp. Stmt. ¶ 25.  Although Dr. Yuh and Dr. Hines met with Dr. Papa in November 2018 to discuss the incident with Plaintiff, Dr. Papa claimed that she was not aware that this meeting was for purposes of counseling.[7]  *Id.* ¶ 26.  No other discipline ever was imposed on Dr. Papa as a result of the September 6, 2018, incident with Plaintiff.

After the incident, Dr. Robustelli informed the partners at SAS that Plaintiff should not be assigned to any of Dr. Papa's cases.  Dr. Robustelli Dep. 194:15–25, ECF No. 75-4, at 13.  There was no written policy, however, within SAS or the Hospital to prevent Plaintiff from working with Dr. Papa.  Furthermore, Plaintiff found himself repeatedly having to switch with other members of SAS when, contrary to this policy, he mistakenly would be assigned to work on a case with Dr. Papa.[8]  Pl.'s Dep. 140:11–141:5, ECF No. 75-3, at 23–24.  Plaintiff was embarrassed by having to switch with his coworkers, particularly when they would question why he needed to switch and whether there was something wrong with him.  Compl. ¶ 64.  At least one member of SAS, Dr. Rafiq, expressed frustration at having to reassign Plaintiff after learning that Plaintiff was not supposed to be in the same OR as Dr. Papa.  Specifically, Dr. Rafiq is alleged to have rolled his eyes at Plaintiff and expressed frustration on assigning Plaintiff to cases.  SAS

---

[7] Dr. Papa testified that she never considered the November 2018 meeting as discipline in the form of counseling.  *See* Dr. Papa Dep. 86:10–15, ECF No. 87-2, at 102.

[8] In spite of SAS's scheduling oversights, Plaintiff never actually worked on a case with Dr. Papa after the incident on September 6, 2018.  SAS Stmt. ¶ 59.

Stmt. ¶ 71.  Ultimately, Plaintiff decided it was untenable to continue working at SAS.  *Id.* ¶ 72.  Plaintiff submitted a resignation letter to Dr. Robustelli on November 30, 2018, and worked his last day on March 1, 2019.  *Id.* ¶¶ 75–76.

## II.   PLAINTIFF'S COMPLAINT

Plaintiff initiated the instant action with a complaint filed May 8, 2020.  In it, he alleges that the Hospital and SAS ("Employer Defendants") failed to provide him with a safe work environment after Dr. Papa committed a physical assault and battery upon him. Compl. ¶ 24.   Plaintiff alleges that Employer Defendants engaged in gender discrimination, and subjected him to a hostile work environment.  Compl. ¶¶ 73–75.  The complaint includes eight (8) causes of action against the Employer Defendants: discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq* (First Cause of Action); retaliation in violation of Title VII (Second Cause of Action); discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60 *et seq.* (Third Cause of Action); retaliation in violation of the CFEPA (Fourth Cause of Action); negligence (Fifth Cause of Action); negligent supervision (Sixth Cause of Action); negligent retention (Seventh Cause of Action); and "negligence *respondeat superior*" (Eighth Cause of Action).

With respect to Dr. Papa, Plaintiff's complaint alleges the following causes of action: assault (Ninth Cause of Action); battery (Tenth cause of action); intentional infliction of emotional distress ("IIED") (Eleventh Cause of Action); negligent infliction of emotional distress ("NIED") (Twelfth Cause of Action); "*prima facie* tort" (Thirteenth Cause of Action); and "slander *per se*" (Fourteenth Cause of Action).

All Defendants have moved for summary judgment with respect to all counts of the complaint.  Plaintiff has moved for summary judgment with respect to his claims of assault and battery against Dr. Papa.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (citations omitted).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.*  The court must also disregard all evidence favorable to the moving party that the jury is not required to believe.  *Redd v. N.Y. State Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).  "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."  *Id.* (citing Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  *Robinson v. Concentra Health Servs.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)).  "[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'"  *Fletcher v. Atex, Inc.*, 68 F.3d

1451, 1456 (2d Cir. 1995) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986)).   Instead, the party opposing summary judgment must set forth in their response "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 243 (1986).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Brown*, 654 F.3d at 358 (internal quotation marks omitted).

## IV.    DISCUSSION

### A.    Dr. Papa – Intentional Tort Claims

Plaintiff and Dr. Papa have filed cross motions for summary judgment.   Plaintiff seeks summary judgment with respect to his claim for battery, while Dr. Papa seeks summary judgment with respect to all claims asserted against her.[9]

i.    <u>Battery</u>

Plaintiff argues that he is entitled to summary judgment with respect to the battery claim because the undisputed facts show that Dr. Papa made an offensive and unwanted contact against him.   Dr. Papa argues that summary judgment must be granted in her favor as Plaintiff cannot demonstrate the *prima facie* elements of battery.

"An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person . . . and (b) a harmful contact with [such]

---

[9] Plaintiff does not oppose Dr. Papa's motion for summary judgment with respect to the NIED claim or the claim for *prima facie* tort.  Pl. Zachary Caldwell's Mem. of Law in Opp'n to Def. Dr. Joey Papa's Mot. for Summ. J. 1, ECF No. 90.  Accordingly, and without opposition, summary judgment hereby is granted in favor of Dr. Papa with respect to Count 12 and Count 13 of the complaint.

person . . . directly or indirectly results." *Maselli v. Reg'l Sch. Dist. No. 10*, 198 Conn. App. 643, 660 (2020).

As to the first element, the Supreme Court of Connecticut has recognized, "intent" involves "(1) a *state of mind* (2) about *consequences* of an act (or omission) and not about the act itself, and (3) it extends not only to having in the mind a purpose (or desire) to bring about given consequences but also to having in mind a belief (or knowledge) that given consequences are substantially certain to result from the act." *Am. Nat. Fire Ins. Co. v. Schuss*, 221 Conn. 768, 776 (1992) (citing W. Page Keeton et al., Prosser and Keeton on the Law of Torts at 34 (5th ed. 1984)) (emphasis in original).  As applied specifically to battery, "under Connecticut law, an actionable . . . battery may be committed willfully or voluntarily (intentionally), recklessly (with a reckless disregard of consequences), or negligently." *Brock v. Dep't of Mental Health & Addiction Servs.*, No. 3:20-cv-1889(CSH), 2022 WL 601812, at *4 (D. Conn. Mar. 1, 2022) (citing string to relevant cases).  "Intentional conduct is, therefore, not always required for . . . battery." *Id.* (citing to string of relevant cases).

Regarding the second element, this court (*Hon. J. Hall, J.*) has defined harmful contact as one "that causes physical impairment of the condition of another's body, physical pain, or illness."  *Margolies v. Millington*, No. 3:16-cv-1872(JCH), 2019 WL 1110793, at *6 (D. Conn. Mar. 11, 2019) (citing to Connecticut Judicial Branch Civil Jury Instructions, at 3.13–2 (Battery), available at: https://jud.ct.gov/Ji/Civil/ [https://perma.cc/BW6B-PKQY] (last visited Sept. 14, 2023); *see* Restatement (Second) of Torts § 15 (1965).  Offensive contact, on the other hand, has been defined as contact that

"offends a reasonable sense of personal dignity." *Margolies*, 2019 WL 1110793, at *6; *see* Restatement (Second) of Torts § 19 (1965).

The record is inconsistent about the nature and severity of the contact and whether it rises to the level of harmful contact. For instance, Plaintiff alleges that the contact caused by Dr. Papa was "an act of violence," Pl.'s Stmt. ¶ 13; however, none of the other four witnesses in the OR could corroborate that such an act of violence actually occurred. *See* Nurse Wuthijaroen Dep. 52:11–23, ECF No. 79-3, at 57; Nurse Bambales Dep. 18:17–19, ECF No. 79-3, at 66; John Doe Dep. 22:5–20, ECF No. 79-3, at 73; *see also* Mancino Dep. 199:21–200:24, ECF No. 79-3, at 82–83 (describing Hospital's investigation involving witness interviews). Moreover, Plaintiff did not experience any bruising, skin irritation, or other injury that necessitated medical treatment. Pl.'s Dep. 115:16–116:21, ECF No. 75-3, at 16–17. The resulting harmful contact, as claimed by Plaintiff, is pain during the moment of the incident, and psychological effects thereafter (panic attacks, insomnia, and anxiety). Pl.'s Stmt. ¶ 21, ECF No. 90-1 at p. 10. And in defining the "harmful contact" element of battery, Connecticut's model jury instructions explain that it includes "physical pain, or illness" that "offends a reasonable sense of personal dignity." *See* Connecticut Judicial Branch Civil Jury Instructions, at 3.13–2 (Battery), available at: https://jud.ct.gov/Ji/Civil/ (last visited Sept. 14, 2023).

However, even if the court were to rely entirely on Plaintiff's allegations, the battery claim must fail as Plaintiff does not dispute that Dr. Papa acted without any intent to cause harmful or offensive contact. Plaintiff relies solely on the fact that Dr. Papa made an offensive contact with his arm. Pl.'s Mem. of Law in Supp. of His Mot. for Summ. J.

Against Def. Dr. Joey Papa 5–6, ECF No. 78.[10]  However, this stated intent with which Dr. Papa grabbed Plaintiff's arm does not satisfy the intent requirement of battery.  From the outset, it cannot be said that Dr. Papa intended to injure Plaintiff in the manner alleged.  Dr. Papa's stated intent, which is not contested by Plaintiff, was to "stop [Plaintiff] from storming past [her]" such that she "continue the conversation" with Plaintiff.  Dr. Papa Dep. 46:10–15, ECF No. 73-1, at 96; see Pl. Stmt. ¶¶ 6, 7 ( "Dr. Papa . . . touched Plaintiff [to]try to stop Plaintiff.").  Because "the resulting injury was not intentional," Dr. Papa's conduct cannot be construed as one which caused a "willful or malicious injury."  *Alteiri v. Colasso*, 168 Conn. 329, 333, 362 (1975).  Moving to the next rung on the ladder, the court finds that Dr. Papa was not acting reckless when reaching out and grabbing Plaintiff's arm.  Connecticut Supreme Court has defined recklessness, in part, to be "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent."  *Matthiessen v. Vanech*, 266 Conn. 822, 833 (2003) (citing to *Craig v. Driscoll*, 262 Conn. 312, 342–43 (2003)).  By first putting her hand out, and only then resorting to touching Plaintiff to get his attention to stop him from leaving the OR, Dr. Papa engaged in reasonable conduct.  Pl. Stmt. ¶¶ 6, 7.  Dr. Papa described her conduct as an "instinctual reach," Dr. Papa Dep. 140:12–15, ECF No. 77-3, at 9, and Plaintiff further admits that this was not a "forceful grab."  Mancino Dep. 98:5–9, ECF No. 73-1, at 59.  Dr. Papa did not make a "conscious choice . . . with knowledge of the serious danger" to Plaintiff when she reached out to grab his arm.

---

[10] Plaintiff seems to argue, by citing the deposition statements made by Dr. Papa, that not all battery claims require an intent to injure.  *See id.* at 4.  Plaintiff seems to try to connect this case with other cases that hold doctors liable for battery where they operate on patients without first obtaining informed consent.  *Id.*  Plaintiff does not explain, however, why this case should be treated similar to an informed consent case.  Plaintiff and Dr. Papa do not have a patient/provider relationship, and there is no issue of consent in this action.

*Maselli v. Reg. Sch. Dist. No. 10*, 198 Conn. App. 643, 663 (2020); *see* Dr. Papa Dep. 140:2–25, ECF No. 77-3, at 9 (suggesting that Dr. Papa had no knowledge of any serious dangers of her action).  Especially given the context, in which both Plaintiff and Dr. Papa were about to sedate and provide surgical care on a patient, Dr. Papa acted with the urgency characteristic of the situation, in a manner that did not recklessly disregard the right of Plaintiff.  *Compare* Dr. Papa Dep. 140:12–15, ECF No. 77-3, at 9 (describing an "instinctual reach" to prevent anesthetist from leaving the operating room) *and Bourne v. City of Middletown*, No. 3:11-cv-309(JAM), 2017 WL 1138125, at *13 (D. Conn. Mar. 27, 2017) (describing an encounter where the defendant "stood in front of plaintiff," demanded plaintiff's key to the office, and "put her arms and hands up and grabbed plaintiff's arm").  Finally, the court finds, that Dr. Papa did not act negligently when reaching out to Plaintiff in the operating room.  Cases from the Supreme Court of Connecticut have adopted the second restatement of torts in defining negligence: "In negligence, the actor does not desire to bring about the consequences . . . There is merely the risk of such consequences, sufficiently great to lead a *reasonable* person in [their] position to anticipate them, and to guard against them."  *Am. Nat. Fire Ins. Co. v. Schuss*, 221 Conn. 768, 776–77 (1992) (citing Restatement (Second) of Torts § 282 (1965)).  Having never worked with Plaintiff, *see* Dr. Papa Stmt. ¶ 10, Dr. Papa could not reasonably have realized that this moment of physical conduct would inflict the alleged injury to Plaintiff.  In other words, "facts within [Dr. Papa's] knowledge" could not have suggested the probability of Plaintiff's injury from this encounter.  *Schuss*, 221 Conn. at 777.  Without this knowledge, the court finds that Dr. Papa acted reasonably in instinctually reaching out to Plaintiff.

Accordingly, as to Count Ten for battery, Plaintiff's motion for summary judgment hereby is denied, and Dr. Papa's motion for summary judgment hereby is granted.

ii.   Assault

Dr. Papa contends that Plaintiff's claim for assault must fail because he cannot demonstrate having suffered any apprehension of an imminent harmful bodily contact.  A common law civil assault is "the intentional causing of imminent apprehension of harmful or offensive contact in another."  *Dewitt v. John Hancock Mut. Life Ins. Co.*, 5 Conn. App. 590, 594 (1985) (citing Restatement (Second) of Torts § 21 cmt. f (1965)).  Unlike the tort of battery, actual physical contact need not occur for a defendant to be liable for the tort of assault.  *Telkamp v. Vitas Healthcare Corp. Atl.*, No. 3:15-CV-726 (JCH), 2016 WL 777906, at *9 (D. Conn. Feb. 29, 2016).  Instead, the act need only cause an "apprehension" of an immediate contact.  *Rogers v. City of New Britain*, 189 F. Supp. 3d 345, 356 (D. Conn. 2016) (citing Restatement (Second) of Torts § 21 cmt. c).  Even mere words, when combined with some overt acts, could establish a cause of action for assault.  *See Rogers*, 189 F. Supp. 3d at 356; Restatement (Second) of Torts § 31 cmt. a.  Moreover, liability only will attach where there exists an intent to inflict a harmful or offensive bodily contact, or an intent to put another in apprehension of such contact.  *Hanson v. Hosp. of Saint Rahapel*, No. CV030480365, 2007 WL 2317825, at *1 (Conn. Super. Ct. July 20, 2007) (citing Restatement (Second) of Torts § 21 cmt. f (1965)).

Plaintiff claims that Dr. Papa put him in apprehension of imminent harm immediately prior to her grabbing his arm in the OR, and also as he left the OR with Dr. Papa following behind him "hurling obscenities."  Pl.'s Mem. of Law in Opp'n to Def. Dr. Joey Papa's Mot. for Summ. J. 8, ECF No. 90 [hereinafter "Pl.'s Opp'n].   With respect to

the events in the OR, Plaintiff testified that "Dr. Papa intercepted me physically" as Plaintiff

walked past her.  Pl.'s Dep. 101:22–102:10, ECF No. 75-3, at 10–11; Pl.'s Stmt. ¶¶ 6, 7.

While the parties disagree as to whether the contact was a momentary light touch, Dr.

Papa Dep. 46:10–23, ECF No. 77-3, at 3, or a forceful grab involving fingernails, Pl.'s

Dep. 102:3–10, ECF No. 75-3, at 11, the undisputed facts demonstrate that the contact

itself was unexpected.  Plaintiff did not have any reason to anticipate Dr. Papa's touch

until it had already occurred.  Pl.'s Dep. 102:3–10, ECF No. 75-3, at 11 (stating that he

was jarred by the encounter).  The record fails to indicate any overt act—beyond Dr.

Papa's mere words addressing Plaintiff's timeliness or his comments in front of the

patient—that could reasonably cause Plaintiff apprehension of an imminent harmful

contact.  Thus, where there is a lack of evidence demonstrating that Plaintiff actually

perceived Dr. Papa approaching him with an intent to harm, no reasonable jury could find

that Plaintiff was put in apprehension of an imminent contact while in the OR.

With respect to the events outside of the OR, the record contains ample support

that Plaintiff experienced apprehension of (another) imminent harmful contact.  Plaintiff

testified that he left the OR and "picked up [his] pace" after hearing Dr. Papa scream "Get

the fuck back here. What the fuck are you doing?"  Pl.'s Dep 103:7–19, ECF No. 75-3, at

12.  As with the battery claim, however, there is no support to indicate that Dr. Papa

intended to cause an imminent or harmful contact, or that she intended to cause within

Plaintiff an apprehension of such contact.  Moreover, Plaintiff acknowledges that Dr. Papa

"wanted to get the surgery underway."  Pl.'s Mem. of Law in Opp'n to Def. Stamford

Hospital's Mot. for Summ. J. 17, ECF No. 87 [hereinafter Pl.'s Opp'n to Hospital"].  There

is no claim, in the complaint or in Plaintiff's briefing, that Dr. Papa followed him to the

anesthesia office for the purpose of committing a harmful contact or the apprehension thereof.   Without the requisite intent, Plaintiff's assault claim likewise must fail. Accordingly, Dr. Papa's motion for summary judgment as to Count Nine hereby is granted.

    iii.    IIED

In Connecticut, a plaintiff asserting an IIED claim must allege that: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Sepega v. DeLaura*, 326 Conn. 788, 800 n.6 (2017).   "Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . ."  *Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000) (internal quotation marks omitted). Thus, "[p]laintiffs in Connecticut are held to a stringent standard when attempting to demonstrate that a defendant's conduct was 'extreme and outrageous.'"  *Sangan v. Yale Univ.*, No. 3:06CV587 (PCD), 2006 WL 2682240, at *4 (D. Conn. Sept. 15, 2006).   "A defendant's conduct that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon [intentional infliction of emotional distress]."  *Id.* at *5 (citing *Appleton,* 254 Conn. at 211).  As stated in the Restatement, and adopted by the Connecticut Supreme Court in *Appleton*:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the

facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46 cmt. d (1965).

Dr. Papa argues that the conduct at issue is neither extreme nor outrageous as the alleged comments lasted no more than "a few minutes" and involved "one isolated incident."  Mem. of Law in Supp. of Def. Dr. Joey Papa's Mot. for Summ. J. 15, ECF No. 79-1.  In opposition, Plaintiff cites that several Hospital employees expressed shock and disapproval upon learning of Dr. Papa's conduct, which the Hospital deemed did not live up to its "values."  Pl.'s Opp'n 10–12.

As an initial matter, whether a defendant's conduct is extreme and outrageous is determined by the court.  *Appleton,* 254 Conn. at 210.  While the reactions of those involved (such as Plaintiff's coworkers) may be useful in informing the decision, the standard to be utilized is "conduct that exceeds all bounds usually tolerated by decent society."  *Id.* at 205 (internal qutoations omitted).  The Supreme Court of Connecticut has recognized that "individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace."  *Perodeau v. City of Hartford*, 259 Conn. 729, 757 (2002).  There are simply "unavoidable part[s] of being employed."  *Id.*

At least one district court has found that grabbing another's arms in the workplace, "while impolite, does not go beyond all possible bounds of decency."  *Williams v. Deloitte Servs., LP*, No. 3:09-CV-17(JCH), 2009 WL 3571365, at *3 (D. Conn. Oct. 26, 2009).  While Plaintiff has pointed to Dr. Papa's profanity and threats, a finding of extreme and outrageous conduct requires more than mere "insults, verbal taunts, threats, indignities,

18

annoyances, petty oppressions, or conduct that displays bad manners or results in hurt feelings." *Miner v. Town of Cheshire,* 126 F. Supp 2d 184, 195 (D. Conn. 2000).

Dr. Papa's conduct in grabbing, chasing, and shouting at Plaintiff may reflect poor manners, and may be one which is subject to workplace discipline, but it is not the extreme and outrageous conduct generally contemplated by an IIED claim.  The conduct at issue must be evaluated in the context in which it arose.  Dr. Papa touched Plaintiff's arm to prevent him from leaving the OR and delaying anesthesia for a patient who was strapped to the operating table and actively awaiting surgery.  When Plaintiff left the OR, Dr. Papa screamed at him and followed him to the anesthesia office and yelled at Plaintiff in front of his supervisor.  This is not conduct which, in the context of attempting to administer time-sensitive care to a hospital patient after allegedly waiting for an anesthetist to arrive, exceeds "all possible bounds of decency."  The court finds that the behavior (as alleged), while far from admirable, falls short of extreme and outrageous conduct for purposes of an IIED claim.  Accordingly, summary judgment hereby is granted in favor of Dr. Papa on Count Eleven.

    iv.   <u>Slander Per Se</u>

Plaintiff alleges a cause of action for "slander *per se*" in his complaint.  Compl. ¶¶ 177–81; Amended Compl. ¶¶ 177–81.  The term "slander" is encompassed within the tort of defamation and refers to oral defamation.  *DeVito v. Schwartz*, 66 Conn. App. 228, 234 (2001).  Plaintiff contends that Dr. Papa caused harm to his professional reputation by (1) screaming, in the vicinity of other Hospital workers, for Plaintiff to "get the fuck back in the OR," and (2) by stating the following in front of Plaintiff's supervisor, Dr. Finkel, and a fellow CRNA, Mr. Demming: "I don't know who the fuck you think you are, but I've been

here (10) ten years. You can't treat me like this. You've been here for (10) ten seconds. You're coming in and yelling that you don't know my patient?"  Amended Compl. ¶ 39.

"[T]o establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Gleason v. Smolinski*, 319 Conn. 394, 430 (2015) (citing *Gambardella v. Apple Health Care, Inc.*, 219 Conn 620, 627–28 (2009)).  A statement is deemed defamatory per se if the defamatory meaning is apparent on the face of the statement.  *Cohen v. Meyers*, 175 Conn. App. 519, 545 (2017).  Statements that have been deemed defamatory per se are those that accuse "a party of improper conduct or lack of skill or integrity in his or her profession or business and the statement is calculated to cause injury to that party in such profession or business.  *Id.*  Connecticut recognizes a distinction between slander per se and libel per se.  *See id.* (noting the "two classes of defamation per se").  For a claim of slander per se, "[s]poken words are actionable per se only if they charge a general incompetence or lack of integrity. They are not slanderous per se if they charge no more than specific acts, unless those acts are so charged as to amount to an allegation of general incompetence or lack of integrity." *Moriarty v. Lippe*, 162 Conn. 371, 384 (1972).

Plaintiff states that "Dr. Papa falsely asserted that her seniority over Plaintiff equates to her being more competent and having integrity and that Plaintiff is not competent and without integrity."  Pl.'s Opp'n 14.  A review of the record, including Plaintiff's own statement of facts, indicates that Dr. Papa made no such assertion. Instead, she stated that she had worked at the Hospital for ten years—which Plaintiff does

not contest—and that Plaintiff had been at the Hospital for ten seconds.  The latter portion of the statement is hyperbolic on its face.  Comparing Plaintiff's tenure with Dr. Papa's tenure does not imply, as Plaintiff argues, that he was "not fit to work at the Hospital."  *Id*. at 16.  The true implication of the statement is that Plaintiff had worked at the Hospital for a shorter period of time than Dr. Papa—a fact that Plaintiff does not contest.  To the extent that Plaintiff complains of Dr. Papa accusing him of unprofessionalism, "a defendant cannot be held liable for expressing a mere opinion."  *Crismale v. Walston*, 184 Conn. App. 1, 18 (2018) (citing *Mr. Chow of N.Y. v. Ste. Jour Azur S. A.*, 759 F. 2d 219, 230 (2d Cir. 1985) and *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2d Cir. 1977)).  Plaintiff has not identified any statement actually uttered by Dr. Papa which directly attacks either Plaintiff's skills as an anesthetist, or his integrity.  Plaintiff's slander per se claim cannot withstand summary judgment.  Accordingly, Dr. Papa's motion for summary judgment hereby is granted on Count Fourteen.

### B.    Hospital – Negligence Claims

Plaintiff's complaint contains eight causes of action against the Hospital, including employment-based claims and negligence claims.  The Hospital has moved for summary judgment with respect to all eight claims.  *See generally* Mot. for Summ. J., ECF No. 71. Plaintiff opposes summary judgment only with respect to the negligence-based claims, which are discussed below.  Pl.'s Opp'n to Hospital. 1 n.1.  Summary judgment hereby is granted as to all other claims against the Hospital.

Plaintiff asserts against the Hospital the following negligence-based common law tort claims: negligence, negligent supervision, negligent retention, and negligence *respondeat superior*.  The Hospital argues, in large part, that it is entitled to summary judgment as Plaintiff has failed to demonstrate that Dr. Papa's conduct was foreseeable.

i.    Negligence, Negligent Supervision, Negligent Retention

In a negligence action, a plaintiff must show that (1) the defendant owed him or her a duty; (2) the defendant breached that duty; (3) the plaintiff's harm was caused by the breach; and that (4) the plaintiff suffered an actual injury.  *LePage v. Horne,* 262 Conn. 116, 123 (2002).  In evaluating whether a duty exists, the "threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant." *Ruiz v. Victory Props., LLC*, 315 Conn. 320, 328 (2015) (citing *Mirjavadi v. Vakilzadeh*, 310 Conn. 176, 192 (2013)).  Foreseeability does not rely on whether the defendant could have anticipated the particular injury that occurred.   Instead, the relevant inquiry is "whether an ordinary person in the defendant's position knowing what the defendant knew or should have known, would anticipate that harm of the *general nature* of that suffered was likely to result."  *Id.* at 328–29 (emphasis added).  In applying this objective test, if the harm is not foreseeable to a reasonable person in the defendant's position, the defendant will not be held to a duty of care, and the negligence claim will fail.

In negligence actions against an employer, the employer may be held liable for failing to exercise reasonable care in supervising an employee who causes foreseeable harm (negligent supervision), *Doe v. Saint Francis Hosp. & Med. Ctr.*, 309 Conn. 146, 190 n. 37 (2013), or where the employer retained an employee after becoming aware that the employee was unfit for the position, and that such retention was likely to cause the sort of harm incurred by the plaintiff (negligent retention), *Faggio v. Brown*, No. X04CV054003488S, 2007 WL 1893682, at *8 (Conn. Super. Ct. June 12, 2007).

Plaintiff argues that "Dr. Papa's antics were well known at the Hospital."  Pl.'s Opp'n to Hospital 10.  He points to Dr. Yuh's deposition testimony that he had received

prior verbal complaints about Dr. Papa's behavior, and that he was concerned about Dr. Papa's collegiality in the workplace.  Dr. Yuh's Dep. 17:16–21, 24:20–25, ECF No. 87-2, at 121–22.[11]  After Plaintiff reported the incident to Dr. Robustelli, she informed him that she was aware of Dr. Papa's behavior, which would frequently go unchecked.[12]  Pl.'s 56(a)(2) Stmt. ¶ 44.  However, Plaintiff admits that prior to the incident on September 6, 2018, the Hospital had never received a complaint claiming that Dr. Papa had engaged in violent behavior, or that she had touched someone inappropriately.  *Id.* ¶¶ 22–23. Although the Hospital may have had notice of Dr. Papa's use of profanity and difficulty getting along with others, the record lacks any evidence suggesting that the Hospital had notice that she could cause harm of the type alleged by Plaintiff: physical pain and psychological distress.  The Hospital had no reason to foresee the conduct or harm alleged by Plaintiff, without a single complaint of such nature in the previous 10 years that Dr. Papa worked there.  And without foreseeability, Plaintiff's negligence claims, including his claims for negligent supervision and negligent retention, must fail.  *See Quichimbo v. Luow*, No. CV176069576S, 2018 WL 6629231, at *6 (Conn. Super. Ct. Nov. 26, 2018) ("It is well settled that defendants cannot be held liable for their alleged negligent hiring, training, supervision or retention of an employee accused of wrongful conduct unless they

---

[11] In his statement of facts, Plaintiff alludes to emails sent by Dr. Yuh in August 2018 regarding complaints against Dr. Papa.  Pl.'s L. R. 56(a)(2) Statement in Opp'n to Def. Stamford Hospital's Mot. for Summ. J. ¶¶ 33, 34, ECF No. 87-1 [hereinafter "Pl.'s 56(a)(2) Stmt."].  Plaintiff also alludes to a suspension, but the record is unclear as to whether Dr. Papa's suspension was the result of a complaint, *id.* ¶ 30, or the result of an administrative issue preventing the surgical scheduler from booking Dr. Papa's surgeries, Dr. Papa Dep. 21:4–12, ECF No. 87-2, at 96 (testifying that surgical scheduler couldn't book surgery until completion of dictation or signature).  And while Plaintiff references emails about previous complaints, he has not submitted any email that substantiate this claim.  *See* Pl.'s 56(a)(2) Stmt  ¶¶ 34, 39 (alluding to emails without attaching them as exhibits).

[12] Dr. Robustelli is a member of SAS, and not an employee of the Hospital. SAS's prior knowledge of Dr. Papa's behavior is insufficient to establish that the Hospital knew or should have known that the harm alleged by Plaintiff would result.

had notice of said employee's *propensity* for the type of behavior causing the plaintiff's harm." (emphasis added)).  Summary judgment is granted in favor of the Hospital with respect to Counts Five, Six, and Seven.

  ii. <u>Respondeat Superior</u>

Plaintiff also asserts a claim for vicarious liability, referenced as "negligence respondeat superior" in the complaint.  The common-law doctrine of respondeat superior holds an employer liable for the tortious conduct of its employees who act in within the scope of their employment and in furtherance of the employer's business.  *See Pelletier v. Bilbiles*, 154 Conn. 544, 547 (1967).  The claim is derivative in nature.  Thus, an employer cannot be held liable for tortious conduct of an employee who is deemed not to have committed any such torts.  As noted above, Dr. Papa did not commit any actionable tort.  Accordingly, Plaintiff's respondeat superior claim cannot survive.  The Hospital's motion for summary judgment as to Count Eight hereby is granted.

  **C. SAS – Employment Claims**

Plaintiff's complaint contains eight causes of action against SAS, including employment-based claims and negligence claims.  SAS has moved for summary judgment with respect to all eight claims.  SAS MSJ, ECF No. 75.  Plaintiff opposes summary judgment only with respect to his employment claims, which are discussed below.  Pl.'s Mem. of Law in Opp'n to Def. Stamford [Anesthesiology Services] Mot. for Summ. J. 1 n.1, ECF No. 86 [hereinafter "Pl.'s Opp'n to SAS"].  Summary judgment hereby is granted as to all other claims against SAS.

  i. <u>Gender Discrimination</u>

In Counts One and Three, Plaintiff asserts claims of sex discrimination in violation of Title VII and CFEPA.  "Title VII makes it 'an unlawful employment practice for an

employer ... to fail or refuse to hire or to discharge ... or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex.'" *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 199 (2d Cir. 2017) (quoting 42 U.S.C. § 2000e-2(a)(1)).  CFEPA similarly prohibits employers from discriminating "against any individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . sex." Conn. Gen. Stat. § 46a-60(b)(1).  Because CFEPA claims are analyzed in the same manner as Title VII claims, the court will address Plaintiff's claims concurrently.  *Vasquez v. Claire's Accessories, Inc.*, 392 F. Supp. 2d 342, 349 (D. Conn. 2005).

To establish a prima facie case of discrimination under Title VII or CFEP a plaintiff must prove (1) membership in a protected class; (2) qualification for the position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of their membership in the protected class.  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 204 (2d Cir. 1995).  "In determining whether the plaintiff has met this *de minimis* initial burden of showing circumstances giving rise to an inference of discrimination, the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive." *Id.* (citing to *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)) (internal quotation marks omitted).  If a plaintiff sets forth a prima facie case, the burden then shifts to the employer to "demonstrate some legitimate, nondiscriminatory reason" for its actions.  *Russell v. Aid to Developmentally Disabled, Inc.,* 753 Fed. App'x 9, 14 (2d Cir. 2018) (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006)).

Here, there is no dispute that plaintiff is within a protected class or that he was qualified for his position as a CRNA.  The parties disagree as to whether any adverse employment actions occurred.  Plaintiff contends that after the incident with Dr. Papa, he was forced to change his schedule constantly, as SAS anesthesiologists would mistakenly schedule Plaintiff on Dr. Papa's cases.  SAS argues that there was no change in Plaintiff's wages, hours, or job duties after the incident.  An adverse employment action occurs where there is a "materially adverse" change in a plaintiff's terms and conditions of employment.  *Galabya v. N.Y.C. Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000).  The working conditions must undergo a change which is "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Id.*  Such materially adverse changes may include termination, demotion, reduced wages, change of title, or significantly reduced responsibilities.  *Id.*  That Plaintiff needed to reschedule when he was mistakenly assigned to Dr. Papa's cases, while certainly inconvenient, is not an adverse change to his employment.  After the incident, Plaintiff continued to work as a CRNA for the same pay, with the same responsibilities, and without any negative response from SAS.  Plaintiff does not allege that his altered schedule caused a reduction in hours, or resulted in assignments to more difficult cases.  He does not allege that switching with other nurses was particularly difficult, nor that he was ever denied such an exchange.  Indeed, he admits that while SAS repeatedly scheduled him to work on Dr. Papa's cases, he never actually worked on a single case with Dr. Papa after the incident.

To the extent that Plaintiff claims that a constructive discharge from his employment constitutes an adverse action, Plaintiff fails to identify any specific cause for his resignation beyond conclusory statements as to the "intolerable" "dark" and "violent"

workplace environment.  Pl.'s Opp'n to SAS 10.  Moreover, courts have found that "if the employment action at issue is the result of the plaintiff's "voluntary resignation," the requirements for an adverse employment action are not satisfied for purposes of a prima facie claim.[13]  *Jones v. Natchaug Hosp., Inc.*, No. 3:17CV1099 (JBA), 2019 WL 4723066, at *8 (D. Conn. Sept. 25, 2019) (finding no adverse employment action where plaintiff voluntarily resigned, and employer had not taken any action against him).  As Plaintiff is unable to demonstrate an adverse employment action, he cannot make prima facie claim for employment discrimination under Title VII or CFEPA.[14]

    ii.    <u>Hostile Work Environment</u>

Plaintiff also asserts a claim premised on a hostile work environment.  To state a hostile work environment claim, a plaintiff must allege "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004).  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).

Plaintiff argues that he was "ostracized at work" by an SAS anesthesiologist with respect to his scheduling and his need to be away from Dr. Papa.  Pl.'s Opp'n to SAS 13.

---

[13] The court notes that Plaintiff continued to work for ninety (90) additional days after he submitted his letter of resignation.  SAS Stmt. ¶¶ 75, 76.

[14] Plaintiff argues in his opposition brief that SAS failed to investigate the incident with Dr. Papa.  Pl.'s Opp. 9-10, ECF No. 86.  He does not articulate why SAS's decision as to an investigation is relevant to the terms and conditions of his employment such that a refusal to investigate constitutes an adverse employment action against Plaintiff.  Likewise, Plaintiff's arguments as to the effect on his reputation is not an adverse employment action taken by SAS against Plaintiff.  Pl.'s Stmt. ¶ 71, ECF No. 86-1. Moreover, any damage to reputation is unsubstantiated, as the record lacks any evidence of consequences to Plaintiff's reputation.

Noting one particular instance, Plaintiff claims that the anesthesiologist, Dr. Rafiq, rolled his eyes and expressed frustration at having to reassign Plaintiff from Dr. Papa's case to different one.  *Id.* at 5.  Plaintiff contends that Dr. Rafiq made such comments because of Plaintiff's gender, implying that Plaintiff is frail.  *Id.* at 13.  However, at Plaintiff's deposition, Plaintiff testified that Dr. Rafiq had made one off-hand comment that had nothing to do with Plaintiff's gender.  Dr. Rafiq stated "Well, where can I put you?" in response to Plaintiff informing him that he should not be working with Dr. Papa.  Pl.'s Dep. 142:7–16, ECF No. 86-2, at 48.  Plaintiff admitted that Dr. Rafiq's comment could be open to interpretation as to whether it was about rescheduling or about accusing Plaintiff as being frail, on the basis of his gender.  *Id.* at 142:19–25.

Plaintiff notes that other coworkers would ask what was wrong with him and why he repeatedly needed to switch cases.  Although Plaintiff cites to "numerous" coworkers making comments, he could identify only two individuals in his deposition.  Pl.'s Dep. 141:3–142:5, ECF No. 75-3, at 25–26. While navigating such comments might be frustrating, they reflect no more than the ordinary inquiries from colleagues that are typical of a workplace environment.  Plaintiff does not allege that he suffered any harassment (beyond seemingly infrequent comments) or intimidation while at SAS.  In fact, Plaintiff's letter of resignation suggests something starkly different.  *See* Resignation Letter, Ex, I, ECF No. 75-11 (describing his time employed at the Hospital and with SAS as "a privilege that [he] will not soon forget" while expressing his gratitude for the opportunity to work with "great group of anesthetists").   The comments, general inquiries, and need to reschedule his cases fall far short of the severe and pervasive standard required for

establishing a hostile work environment claim.  Accordingly, SAS's motion for summary judgment hereby is granted with respect to Counts One and Three.

     iii.   <u>Retaliation</u>

Title VII makes it unlawful "for an employer to discriminate against any . . . employee[ ] . . . because [that employee] opposed any practice" made unlawful by other provisions of Title VII.  42 U.S.C. § 2000e-3(a); *see Lenzi v. Systemax, Inc.*, 944 F.3d 97, 112 (2d Cir. 2019).  Retaliation claims are analyzed under the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 (1973):  The first step requires a plaintiff to establish a prima facie case "by showing (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Lenzi*, 944 F.3d at 112 (citing *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010)).

If the plaintiff meets the initial burden of showing a prima facie case of retaliation, "a presumption of retaliation arises," and the defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.* (citing *Legg v. Ulster Cnty.*, 820 F.3d 67, 73 (2d Cir. 2016)).  "The burden is one of production, not persuasion."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). That is, the defendant must then produce an explanation to "rebut the prima facie case." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07 (1993).  The defendant can do so by providing an explanation, support with evidence, that "the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'"  *Id.* (citing to *Tx. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981)).  If the defendant meets this burden, the

presumption of retaliation under the *McDonnell Douglas* framework is no longer relevant and the burden shifts back to the plaintiff. *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 141–42 (2d Cir. 1993). Plaintiff must then "demonstrate by competent evidence" and by preponderance of the evidence that the reasons offered were "a pretext for discrimination." *Burdine,* 450 U.S. at 253, 255 n.10 (1981).

Plaintiff argues that he "clearly suffered adverse employment actions" after reporting the incident with Dr. Papa, but he fails to identify any specific adverse employment actions constituting retaliation. Pl.'s Opp'n to SAS 15–16. To the extent that Plaintiff premises his retaliation claim on the same facts as his discrimination and hostile work environment claims (having to reschedule himself, dealing with remarks from coworkers, and his constructive discharge), the retaliation claim fails, as Plaintiff has not demonstrated that such actions were materially adverse.

Moreover, the record contradicts any claim of retaliation. SAS encouraged Plaintiff to file the human resources report against Dr. Papa. *See* Pl.'s Dep. 105:22 – 106:7, ECF No. 75-3, at 14–15 (stating that Dr. Robustelli told Plaintiff to "report this to [the Hospital's] HR system"). SAS made an accommodation for Plaintiff by informing its anesthesiologists not to schedule him with Dr. Papa. Dr. Robustelli's Dep. 194:18–25, ECF No. 75-4, at 13. SAS did not investigate the incident because, as admitted by Dr. Robustelli, it immediately believed Plaintiff. *See id.* at 141:3–25 (acknowledging that the interaction with Dr. Papa would have been "really stressful" and that it was "not a minor thing"). In light of the foregoing, SAS is entitled to summary judgment as to Counts Two and Four.

**V.      CONCLUSION**

For the reasons stated herein, Plaintiff's motion for summary judgment (ECF No. 76) hereby is **<u>DENIED</u>.**  The summary judgment motions filed by the Hospital (ECF No. 71), SAS (ECF No. 75), and Dr. Papa (ECF No. 79) hereby are **<u>GRANTED</u>** as to all counts directed to each defendant. The Clerk of Court kindly is instructed to render judgment in favor of Defendants and to terminate this case.

**IT IS SO ORDERED** at Hartford, Connecticut, this 2nd day of October, 2023.

_/s/_____

Omar A. Williams
United States District Judge
